UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**CENTER FIELD PROPERTIES LLC**,

Debtor.

Case No. **12-60854-11**

## MEMORANDUM OF DECISION

At Butte in said District this 3rd day of July, 2013.

Pending in this Chapter 11 case is the Motion filed by Hawthorn Suits Franchising, Inc. ("HSF") (Docket No. 55) for payment of the sum of $85,736.08 as a postpetition administrative claim under 11 U.S.C. § 503(b)(1)(A) ("Motion") based on a "License Agreement" with the Debtor and Debtor's use of HSF's reservation system and advertising.  Debtor Center Field Properties, LLC ("Center Field" or "Debtor") filed an objection to the amount requested, contending that HSF should be allowed an administrative claim in the sum of $4,343.35 for actual benefit to the estate under § 503(b)(1)(A).  A hearing on HSF's Motion was held after notice at Missoula on April 11, 2013.  Witnesses testified and exhibits were admitted into evidence.  At the conclusion of the parties' cases-in-chief the Court granted the parties time to file briefs, which have been filed and reviewed by the Court together with the record and applicable law.  This matter is ready for decision.  At issue is the amount of administrative claim to which HSF is entitled for actual, necessary costs of preserving the estate under § 503(b)(1)(A). For the reasons set forth below, based on Ninth Circuit law the Court sustains Debtor's objection and awards HSF the sum of $4,489.26 as an administrative expense.

This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).  HSF's Motion for payment of administrative expense under § 503(b)(1)(A) is a core proceeding under 28 U.S.C. § 157(b)(2).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

HSF was represented at the hearing on April 11, 2013, by attorneys Michael J. Connolly ("Connolly") of the law firm Forman Holt Eliades & Youngman, LLC, of Paramus, New Jersey, and John H. Grant of Jackson, Murdo & Grant, P.C. of Helena, Montana.  The Debtor was represented by attorney James A. Patten ("Patten") of Patten, Peter man, Bekkedahl & Green, PLLC, of Billings, Montana.  Robert Spence ("Spence") testified, as did Debtor's member and manager Thomas J. Poindexter ("Poindexter").  Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, and A were admitted into evidence.

## FACTS & PROCEDURAL HISTORY

Spence has been employed by Wyndham Hotel Group, LLC ("Wyndham") since 1993, and presently is employed as its director of financial services.  He testified that Wyndham is a Delaware company which operates the largest hotel franchise in the world, including franchises operating under the name of Ramada Inn, Howard Johnson's and Hawthorn Suites.

HSF operates the franchise system for Wyndham, including a system of trademarks, copyrights, trade secrets, a rewards system, access to a centralized reservation system ("CRS"), which collectively are referred to as "Hawthorn Marks," and access to Wyndham's television and internet advertising and Wyndham's loyalty rewards program[1].  Spence testified that HSF does

---

[1] Spence testified that all Wyndham's brands participate in the Wyndham rewards system, including Hawthorn Suites.  A customer at any of the Wyndham brands earns points which may be used at any of the other Wyndham hotels.

not promote any specific hotel, but rather promotes the Wyndham brand itself which is recognizable. Under cross examination Spence testified that Wyndham provided all advertising at the brand level.[2] Spence could not identify any Hawthorn Suites hotel other than Center Field's hotel in Missoula in several western states, but he believed other Hawthorn Suites are located west of the Mississippi River and he testified that about one hundred Hawthorn Suites hotels are located in the United States.[3]

Spence testified that HSF's Hawthorn Marks system provides franchisees with the opportunity to compete effectively. The Hawthorn Marks and logo are registered in the U.S. Patent and Trademark Office, and only HSF has the right to license Hawthorn Marks. Spence testified that the benefits to the Hawthorn Marks include access to HSF's CRS and HSF's marketing.

HSF has a toll free "800" phone number for reservations, as does Wyndham.[4] HSF has its own website, and HSF's CRS also gives participants links to airline websites and reservation websites such as Expedia and hotel.com. Spence testified that HSF negotiates all fares and rates with other websites, so its licensees have instant availability to the other websites without the need to negotiate with each website company.

In order for a hotel to use the Hawthorn Marks system it must sign a license agreement and make payments to HSF. If an licensee fails to pay under a license agreement HSF issues

---

[2] On cross examination Spence admitted that he could not say that Wyndham provided any advertising which was specific to Hawthorn Suites.

[3] Poindexter identified one Hawthorn Suites west of the Mississippi in the State of Washington, another in Sacramento and a third in Lubbock, Texas.

[4] The two 800 phone systems have the ability to transfer calls between them.

3

default notices. Center Field signed a License Agreement with HSF, Ex. 1, dated November 7, 2007. Ex. 1 authorized Center Field to obtain a license to use HSF's Hotel System to operate a Hawthorn Suites hotel at the intersection of Airway Blvd and Expressway Blvd in Missoula.

Poindexter signed Ex. 1 as member of Center Field, and personally as the guarantor for Center Field. Poindexter testified that Center Field purchased the hotel from Hyatt, and transferred the franchise to Wyndham. The Missoula Hawthorn Suites franchise opened in February 2009 and operated as a HSF franchisee[5] until December 12, 2012. A Hawthorne Suites sign was placed in front of Center Field's hotel.

Poindexter testified that Center Field tracks the origin of its guests. He testified that most of Center Field's guests are Montana residents and the next largest percentage are from the State of Washington. Poindexter testified that Center Field purchases its own television advertising for its hotel, that he was not aware of any national advertising for Hawthorn Suites which was provided by HSF,[6] and no name recognition occurred among his guests in Montana for the Hawthorn or Wyndham brand.

Spence described the obligations which HSF owed to Center Field under Ex. 1 as in the form of education and training opportunities, and providing manuals for the licensee to conduct training and operations. Ex. 1 also provides for payment of fees by the licensee, which Spence testified were calculated by a percentage of gross revenues per month which are to be reported by the franchisee in a "self-reporting system." Section 13J of Ex. 1 provides that if HSF is a party to

---

[5]Poindexter testified that the only requirement Wyndham had for Center Field to use the Hawthorn Suites Marks was to have available twenty-five rooms with kitchens.

[6]Poindexter testified that he asked HSF about its advertising for Hawthorn Suites, but he got no reply from HSF.

any legal proceeding related to the License Agreement, the franchisee will be liable for all reasonable attorney fees and costs incurred to enforce the obligations.

Spence testified that Center Field operated the Missoula hotel as a Hawthorn Suites, that HSF performed its obligations owed under Ex. 1, including providing advertising through Hawthorn and Wyndham, and that the Debtor used the Hawthorn sign and Hawthorn Marks throughout the hotel but did not comply with the License Agreement. Poindexter testified that, despite the Hawthorn Suites sign, Center Field's guests at its Missoula hotel had no name recognition of Hawthorn, Wyndham, or the Hawthorn Marks, and the guests were confused. He testified that Center Field had very little contact with HSF or Wyndham since day one.

Spence testified that HSF never refused to provide Center Field with any training or other benefits under the License Agreement for the period from May 2012 through December 2012, and Center Field was not excluded from HSF's advertising campaign during that period. On cross examination Spence could not identify any training which HSF actually provided to Center Field from May through December 2012, but on redirect examination Spence testified that Center Field could have taken advantage of training. Poindexter testified that he never asked for and consequently was never refused training by HSF, but he testified that it was difficult to get any response from HSF.

Spence testified that Center Field did not comply with Ex. 1 and did not make any of the payments due under Ex. 1 from May 2012 through December 2012 even though the Debtor continued to use HSF's CRS and sign. Ex. 5 is a entry log of room royalty, advertising fund royalty, and room revenue for the first eleven months of 2012, which Spence testified was reported by Poindexter. Spence testified that the room royalties on Ex. 5 were calculated at five

5

percent (5%) of the room revenue for each month, and the advertising funds royalty was calculated at 2.5% of the room revenue in accordance with Ex. 1. The total franchise fee rate was 7.5%.

Ex. 4 is a table which includes HSF's calculation of the average daily rate ("ADR"), and revenues which the Debtor received from February 4, 2009, through December 31, 2012. Spence testified that Ex. 4 shows the revenues attributable to HSF's CRS based on the Debtor's actual sales reported other than for December 2012, which HSF estimated from December of the previous year. Poindexter admitted that Center Field reported its revenues to HSF, and that Center Field used a user specific password to report its revenues.

Spence testified that Ex. 4 shows the percentage of Center Field's revenues attributable to its CRS. For example, Ex. 4 shows for June of 2010 that 40.6% of rooms and 40.15% of Center Field's revenues were booked through HSF's CRS. Spence testified that for the entire period shown by Ex. 4, between 20% to 30% of Center Field's room revenues came from HSF's CRS. On cross examination Spence testified that the remaining revenues were still a result of HSF's logo and brand recognition. Spence admitted, however, that reservations originating from Expedia, Priceline, and other websites show up on Ex. 4 as originating from HSF's CRS.

Poindexter disagreed with the revenue source calculations on Ex. 4. The June 2012 CRS revenue contribution on Ex. 4 is stated as 35.21%. On cross examination Poindexter testified that the 35.21% figure includes revenue which the Debtor generated itself, but Center Field's own reservations went through HSF's CRS.

Spence testified that Poindexter received training from HSF under Ex. 1, that the Debtor had access to HSF's CRS during the term Ex. 1 was in effect, and Ex. 1 was never suspended.

6

Poindexter testified that the CRS is the main liaison between the hotel and guest, and that all of Center Field's bookings from outside travel agents ("OTA"), expedia, and other sources went through HSF's CRS.

Ex. 6 is a printout of an Oracle report of reservations at Center Field's hotel. Spence testified that the Debtor benefitted from being on HSF's CRS. Poindexter disagreed. He testified that Center Field tracks its reservations, and that most of its reservations originate in its hotel itself from phone calls and from traffic off nearby interstate highway I-90. Poindexter testified that 85% of Center Field's hotel guests came directly to the hotel for the period from May 2012 to December 2012 during its Chapter 11 case; another approximately 10% originated from OTA, and the remainder came from the Wyndham 800 phone number and HSF's CRS.

Ex. A is a document prepared by Poindexter entitled "Reservations Booked Direct from Wyndham Sources" which Poindexter testified he prepared from hotel records and which reflects the room revenues attributable to Wyndham's 800 phone number, Wyndham travel agents and Hawthorn websites[7] for the period from May 29 to December 12, 2012. Ex. A shows the room revenues, percentage of total bookings, number of reservations, average daily rate ("ADR") and the percentage of total bookings attributable to Wyndham travel agents. According to Ex. A Wyndham sources provided the Debtor with an average of 4.4% of its total bookings, and Wyndham's travel agents provided an average of .05% of bookings.

On Ex. A Poindexter added the total room revenue attributable to Wyndham sources ($58,836.82) with $1,020.00 in revenues from Wyndham travel agents for a total revenue

---

[7]Ex. A includes the Debtor's local website Hawthornmt.com, which Poindexter was unable to separate because the local site automatically forwarded to Hawthorn.com in New Jersey.

attributable to Wyndham in the amount of $59,856.82. Poindexter multiplied that by HSF's 7.5% franchise fee and arrived at a total amount of $4,489.26 which he testified was the Debtor's total revenue attributable to HSF's system and for which HSF is entitled to an administrative claim. Poindexter testified that he does not know of any benefit Center Field received from Wyndham advertising.

Asked about the Wyndham Rewards Program and its benefit to the Debtor, Spence testified that Hawthorn Suites is part of that reward program and that its guests look forward to earning points and rewards, and that the Debtor received the benefit of that reward program as well as the advertising about Wyndham Rewards. Ex. 3 shows "Wynrewards" credits and charges, and Spence testified that for the period from August to October 12, 2012, the Debtor received more from the reward program than it paid out. Ex. 3, p. 3. Page 4, on the other hand, shows a Wynrewards credit of ($1088.16) which exceeds the $170 revenue.

Poindexter testified that the Wyndham Rewards program did not benefit Center Field's hotel, and that its net from the reward program was negative. He testified that his guests did not come to Center Field's hotel because of the Wyndham Rewards program. On cross examination Poindexter admitted that HSF never told Center Field that it could not use the reward system.

As of 2013, Spence testified the Debtor was no longer a licensee of HSF. Center Field changed the name and signage[8] of its hotel to Stone Creek. Poindexter testified that Center Field's hotel has had a higher volume of booking as Stone Creek than it did the previous year as a Hawthorn Suites. He testified that under the new name Stone Creek set up its own CRS through a service called "Saber," which he said is the same service which Wyndham used for its

---

[8]Poindexter did not know when the Hawthorn sign was removed.

8

CRS.

Center Field filed its voluntary Chapter 11 petition on May 29, 2012, and filed its first Schedules and Statement of Financial Affairs on June 12, 2012. Schedule F lists Wyndham as a creditor holding a disputed unsecured nonpriority claim described as a "royalty fee" in the amount of $55,113.55. Schedule H lists among executory contracts and unexpired leases the "Franchise Agreement" with Wyndham.

Although Center Field filed its petition in May 2012, it remained in HSF's system until December 12, 2012, during which the Hawthorn sign remained in place and the Debtor had access to HSF's CRS. The Debtor's Chapter 11 Plan filed on August 27, 2012, at page 6, paragraph 7.01, rejects the License Agreement because, Poindexter testified, it was costing the Debtor more than the revenues it generated.

On July 9, 2013, HSF filed Proof of Claim No. 1 asserting a Proof of Claim in the amount of $55,248.83 based on the License Agreement. No objection to HSF's Claim 1 was filed and it is deemed allowed under 11 U.S.C. § 502(a).

On November 27, 2012, HSF filed its Motion for payment of administrative claim, combined with a motion for relief from the stay to terminate the License Agreement and to compel de-identification of Debtor's facility. Other than the amount of HSF's administrative claim, HSF's Motion was resolved by stipulation (Dkt. 75) with the Debtor filed on December 12, 2012, and approved by the Court.

The hearing on confirmation was held on December 6, 2012. HSF filed an objection to confirmation, but its objection was resolved by the stipulation with the Debtor. The Court confirmed Debtor's Chapter 11 Plan on December 12, 2012. The hearing on HSF's Motion was

continued until April 11, 2013.

Ex. 3 is HSF's post-petition statement of amounts owed as of April 2, 2013. Spence testified that Ex. 3 was prepared by HSF from the revenues reported by the franchisee, and that Ex. 3 includes the amounts owed for January, February and March of 2013. The last page lists a total amount owing of $138,768.11. Spence was asked on cross examination about the charges during 2013. Spence admitted that the franchise terminated on December 12, 2012, and that the Debtor was not under the HSF franchise after 2012 so HSF does not claim an administrative expense for royalty or marketing charges after December 12, 2012. On page 6 of Ex. 3 there is a $4,060.95 entry dated December 12, 2012, labeled "Accrual-1000A-R." Spence testified that the system estimated that charge for the entire month of December because the Debtor failed to report its revenues for that month.

## DISCUSSION

HSF's Motion asks for allowance of an administrative claim due under Ex. 1 in the amount of $85,736.08 under § 503(b)(1)(A) which provides that there shall be allowed administrative expenses, including "(A) the actual, necessary costs and expenses of preserving the estate . . . ." HSF cites the Fifth Circuit test for administrative claims under § 503(b)(1)(A) from *In re Jack/Wade Drilling Inc.*, 258 F.3d 385, 387 (5th Cir. 2001), citing *Toma Steel Supply Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992). The citation to *Jack/Wade* is curious, because the Fifth Circuit affirmed a district court's judgment denying an administrative claim for postpetition attorney fees

and costs, finding that the exception[9] created in *Reading Company v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) did not extend to the litigant's postpetition claim. *Jack/Wade*, 258 F.3d at 386, 392. This Court is bound by Ninth Circuit precedent.

The burden of proving an administrative expense claim is on the claimant. *In re Santa Monica Beach Hotel, Ltd.*, 209 B.R. 722, 725 (9th Cir. BAP 1997), citing *In re DAK Indus., Inc.*, 66 F.3d 1091, 1094 (9th Cir.1995); *In re Pulliam*, 2012 WL 4482577, *2 (Bankr. D. Mont.). The bankruptcy court has broad discretion to determine whether to grant a § 503 claim. *Id.* In order to keep administrative costs to the estate at a minimum, actual, necessary costs and expenses of preserving the estate are construed narrowly. *Id.*; *In re Palau Corp.,* 139 B.R. 942, 944 (9th Cir. BAP 1992), *aff'd*, 18 F.3d 746, 750 (9th Cir. 1994).

The issue before this Court is not whether HSF is entitled to any administrative claim under § 503(b)(1)(A) for the Debtor's use of the Hawthorn Marks. Debtor has conceded that HSF's Motion should be granted and an administrative claim should be allowed in the amount of $4,343.55. Debtor's Ex. A shows that HSF should be allowed a slightly greater amount, $4,489.26, calculated from room revenue and revenue from Wyndham travel agents for the period from May 29, 2012, through December 12, 2012. Neither does the Court here decide whether the Debtor is liable to HSF under applicable nonbankruptcy law, including ordinary principles of contract law, or any issue relating to Poindexter's guarantee. Rather, the Court decides only the amount of HSF's administrative claim to be allowed under § 503(b)(1)(a).

HSF's brief argues that it is entitled to allowance of an administrative claim for recurring

---

[9]The exception created by the Supreme Court in *Reading* is for damages inflicted on innocent third parties through a trustee's operation of the estate, even when no actual benefit to the estate resulted. 391 U.S. at 485.

fees incurred under Ex. 1 from the petition date, but the brief does not state a specific amount. HSF's Motion requests an administrative claim for recurring fees due under Ex. 1 in the sum of $85,736.08, but does not explain how it arrived at that amount.

Ex. 3 is HSF's postpetition statement of amounts owed from Debtor's use of the Hawthorn Marks. It states a "grand total" in the amount of $129,286.83 on page 6, and to the right has a column total of $138,768.11. Ex. 3 includes amounts after December 12, 2012, when the Debtor terminated the License Agreement. In addition, Spence testified that Ex. 3 included estimates because the Debtor ceased self-reporting its revenues into the HSF system.

For the remainder of HSF's administrative claim request, to which the Debtor objects, the Ninth Circuit explained the applicable standard *In re Metro Fulfillment, Inc.*, 294 B.R. 306, 309 (9th Cir. 2003):

> Section 507(a)(1) accords administrative expenses of a bankruptcy estate first priority, and § 726(b) makes chapter 7 administrative expenses prior to those from chapter 11 in cases converted from chapter 11 to chapter 7. Section 503(b)(1)(A) allows for administrative expenses, "including ... the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case ...." Administrative expenses
>
>> must be the actual and necessary costs of preserving the estate for the benefit of its creditors. The terms "actual" and "necessary" are [to be] construed narrowly ....
>
> *Burlington N.R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 706 (9th Cir.1988) (citations omitted).
>
> To establish an administrative expense claim, a claimant must show that the debt:
> (a) arose from a transaction with the debtor in possession as opposed to the preceding entity...; and
> (b) directly and substantially benefitted the estate.

12

*Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir.1995).

HSF's brief cites cases from other circuits in support of its Motion, including *In re B-K of Kan. Inc.*, 82 B.R. 135 (Bankr. D. Kan. 1988), *In re Beverage Canners Int'l Corp.*, 255 B.R. 89 (Bankr. S.D. Fla. 2000), *Meredith Corp. v. Home Interiors & Gifts Inc.*, Dkt. 648, Case No. 08-61961 (Bankr. N.D. Tex. October 9, 2008), and *In re Shreyas Hospitality, LLC*, 2010 Bankr. LEXIS 2074 (July 15, 2010).  In addition to being from outside the Ninth Circuit, those cases are of little aid in resolving the dispute regarding the specific issue of the amount of HSF's administrative claim to be allowed.

The Debtor argues that it rebutted the presumption of benefit received under the executory contract by showing that the Debtor obtained only $59,856.82 in revenue attributable to the Hawthorn system on Ex. A, that Debtor received no brand specific advertising from HSF or Wyndham, and received no benefit from Wyndham's advertising, and the Wyndham Rewards program cost the Debtor more than it earned from it.

Section 503(b)(1)(A) is construed narrowly in order to maximize and protect the limited assets of the bankruptcy estate for the benefit of the unsecured creditors.  *Palau*, 18 F.3d at 750. After considering the parties' evidence and witness testimony, the Court finds and concludes the actual, necessary costs and expenses of preserving the estate which should be allowed to HSF is the amount of $4,489.26 shown by Ex. A and Poindexter's testimony.

Spence testified that the Debtor received a benefit from the use of HSF's training, advertising and CRS.  However, he repeatedly stated that the Debtor had the opportunity to take advantage of HSF's training and manuals.  He did not testify that the Debtor actually received

any training from HSF. Wyndham's advertising was not provided for Center Field's hotel, but rather only for the Wyndham brand. Poindexter's testimony that the Debtor's guests did not recognize HSF's brand is uncontroverted, as is his testimony that the Wyndham Rewards program cost the Debtor more than it generated in revenue.

HSF's Ex. 3 was offered to show that HSF's administrative claim should be awarded in the larger amount, which its Motion specifies is $85,736.08. However, Ex. 4 shows that the revenues attributable to HSF's CRS exceeded 40% of Center Field's revenues only once in June of 2010, and in 2012 the revenues attributable to HSF's CRS exceeded 35% twice. This evidence corroborates Poindexter's testimony and Ex. A showing that the revenues attributable to HSF's CRS and Wyndham travel agents were much lower than the revenues stated on Ex. 3. Almost all of the Debtor's revenues from reservations made by phone or internet were routed through HSF's CRS, even reservations made through non-HSF OTAs and unrelated websites. After rejection of the License Agreement the Debtor quickly replaced HSF's CRS with its own.

Ex. A shows total revenue attributable to Wyndham sources in the amount of $59,856.82, against which Debtor applied Ex. 1's total franchise fee of 7.5% to reach Debtor's claim amount of $4,489.26. Ex. 3 includes revenues reaching into March of 2013, including after the License Agreement was rejected, and Spence admitted that HSF estimated revenues on Ex. 3 when the Debtor stopped self-reporting.

The Court considers the Debtor's evidence in the form of Poindexter's testimony, and Ex. A, to be more specific and worthy of more weight than HSF's evidence, which appears to simply declare its claim by applying its franchise fee to all of the Debtor's revenues. The Court finds and concludes that HSF failed to satisfy its burden of proof to show that it satisfied the

requirements for an administrative expense in the amount of $85,736.08 under § 503(b)(1)(A) under the narrow construction in this Circuit as explained in *Santa Monica*, 209 B.R. at 725. *See also Metro Fulfillment*, 294 B.R. at 309. Construing the Motion narrowly, the Court concludes that HSF failed to show that its Hawthorn Marks "directly and substantially benefitted the estate" to the extent of $85,736.08 as required for allowance under § 503(b)(1)(A). *Metro Fulfillment*, 294 B.R. at 309; *DAK Indus.,* 66 F.3d at 1094. Accordingly, in the exercise of its broad discretion the Court will allow HSF's an administrative claim under § 503(b)(1)(A) to the extent of $4,489.26 in accordance with the Debtor's evidence, but otherwise denies it.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 11 case under 28 U.S.C. § 1334(a).

2. HSF's Motion for payment of administrative expense under § 503(b)(1)(A) is a core proceeding under 28 U.S.C. § 157(b)(2).

3. HSF is entitled to an administrative claim in the amount of $4,489.26 under 11 U.S.C. § 503(b)(1)(A) for the actual, necessary costs and expenses of preserving the estate.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above granting HSF's Motion in part and allowing HSF a total of $4,489.26 as an administrative expense under § 503(b)(1)(A), but otherwise denying HSF's Motion.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana